**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ X

REBECCA ALLEN,                            :

                                    :

                  Plaintiff,        :        Civil Case No.:

                                    :

          v.                      :

                                    :        **COMPLAINT**

THE GOLDMAN SACHS GROUP, INC. and    :

CHRISTINA MINNIS, in her official and      :

individual capacities,                  :        **Jury Trial Demanded**

                                    :

                  Defendants.     :

------------------------------------------------------------ X

        Plaintiff Rebecca Allen ("Ms. Allen" or "Plaintiff"), by her attorneys, Wigdor LLP and

Goodstadt Law Group, PLLC, as and for her Complaint in this action against The Goldman

Sachs Group, Inc. ("Goldman Sachs" or the "Bank") and Christina Minnis ("Ms. Minnis" and,

together with Goldman Sachs, "Defendants"), hereby states and alleges as follows:

## NATURE OF THE CLAIMS

        1.      Growing up, Ms. Allen learned about her mother's upbringing in the

segregationist south in the 1950s.  Ms. Allen was told harrowing stories of racism and

discrimination, and that her mother was not permitted to go to school with White children and

instead forced to attend an all-Black school.  However, as Ms. Allen understood it, times had

changed and in twenty-first century America – particularly in New York City – an individual

could count on being evaluated based on their intelligence, acumen and skill, rather than the

color of their skin.

        2.      Ms. Allen worked tremendously hard to obtain the best possible education and put

herself in a position to succeed, obtaining a Bachelor's degree from Williams College and a

Masters in Finance from Columbia University.  In 2012, Ms. Allen was hired into the Private

Wealth Management ("PWM") Division of Goldman Sachs, one of the country's oldest and largest investment banks.  Ms. Allen believed she had broken through whatever color barrier still existed and looked forward to a long and successful career at the Bank.

3.     Unfortunately, however, Ms. Allen quickly learned that segregation is alive and well on Wall Street, and any notion that she would be judged on her merits and not her race was quickly dispelled.

4.     Despite her outstanding work product and results, Ms. Allen has been discriminated against in myriad ways throughout her employment with Goldman Sachs.

5.     The discrimination committed against Ms. Allen should come as no surprise given that the Bank has virtually no Black presence in its leadership.

6.     There is only one Black employee on Goldman Sachs's 32-person Management Committee.  See http://www.goldmansachs.com/who-we-are/leadership/management-committee/index.html.

7.     Out of the ten Executive Officers at the Bank, only one is Black (and she is the Global Head of Human Capital Management, a/k/a Human Resources).  See http://www.goldmansachs.com/who-we-are/leadership/executive-officers/index.html.

8.     Similarly, there is only one Black member of the Bank's Board of Directors.  See http://www.goldmansachs.com/who-we-are/leadership/board-of-directors/index.html.

9.     The PWM Division is part of the Bank's Investment Management Division.  The Investment Management Division is led by co-heads Eric Lane and Timothy O'Neill, both of whom are White.  There are approximately 45 Partners in the Investment Management Division, none of whom are Black.  Less than two percent of the Managing Directors ("MDs") in the Investment Management Division are Black.

10. This lack of diversity is also present in the Bank's PWM Division. The Global and US head of the PWM Division is Tucker York, who is White. There is only one Black MD in the PWM Division. The head of Ms. Allen's group, Greg Hoogkamp is also White, as is the head of the Bank's New York City office, Gary Giglio. Ms. Allen's direct supervisor, Corey Jassem, also is White.

11. Simply put, Goldman Sachs does virtually nothing to hire, promote or develop Black talent, instead focusing its efforts on retaining and promoting White employees to positions of leadership.

12. As a result of this pattern and practice of discriminatory conduct, the few Black employees at the Bank are marginalized and subjected to disparate treatment in a variety of ways, including in compensation, promotions and opportunities to develop client relationships and earn commissions. Ms. Allen has experienced this discrimination directly.

13. By way of example only, unlike her White colleagues, Mr. Hoogkamp has never given Ms. Allen the opportunity to "steer" a potential client who comes to the Bank unsolicited. Opportunities to steer are vital, as they are one of the ways in which PWM employees can add to their book of business, which has a direct correlation to compensation and promotion opportunities.

14. In addition, when a PWM employee leaves the Bank, his or her clients are redistributed. Over her nearly five-year employment with Goldman Sachs, Ms. Allen has received substantially fewer and less valuable clients than her male colleagues. Again, this has a direct impact on Ms. Allen's compensation and chances for future promotions.

15.     Even when Ms. Allen puts substantial work into developing her own clients, she often is not given credit for her work and, recently, has had a client taken away from her for explicitly racist reasons.

16.     Indeed, Ms. Allen spent nearly three years working a potential client relationship with Brent Saunders, the Chief Executive Officer ("CEO") of Allergen (and former CEO of Bausch & Lomb and Forest Laboratories).  As a result of Ms. Allen's hard work, Mr. Saunders expressed interest in committing significant assets to PWM.

17.     However, in or around mid-November 2016, Ms. Allen was abruptly removed from the Saunders relationship without explanation, despite her invaluable contributions over the previous three years.  Defendant Minnis, a White Partner in the Bank's Investment Banking Division, was responsible for this decision.

18.     Mr. Jassem offered to, and did, speak with Ms. Minnis, who was responsible for removing Ms. Allen, to determine the basis for the transfer.

19.     Mr. Jassem spoke with Ms. Minnis on or about November 18, 2016.  Immediately after that conversation, Mr. Jassem told Ms. Allen that Ms. Minnis had made numerous racist comments, as well as anti-Semitic comments during his meeting with her, suggesting that Ms. Allen had been removed from the relationship because she is Black and Jewish.

20.     Indeed, Ms. Allen has also been subjected to various discriminatory comments based on the fact that she is Jewish, including various inquiries clearly designed to determine "how Jewish" Ms. Allen is, given that she is Black.

21.     As a result of the transfer of the Saunders relationship, Ms. Allen expects that she will miss out on $300,000 per year in compensation.

22.     Following this transfer, Ms. Allen has repeatedly questioned Goldman Sachs's decision not to take any action in response to Ms. Minnis's discriminatory conduct.  Ms. Allen has been given the run-around and has been provided with multiple shifting and inconsistent reasons for the decision.

23.     For instance, Mr. Jassem subsequently changed his story, later telling Ms. Allen that Ms. Minnis had only made anti-Semitic comments, and not the other "racist" comments he had originally admitted to Ms. Allen.  When Ms. Allen accused Mr. Jassem of changing his story, and pointed out that anti-Semitic comments still represented discrimination as she was also Jewish, Mr. Jassem dismissed Ms. Allen's concerns and criticized her for being "hypersensitive."

24.     Nevertheless, Goldman Sachs has done nothing to remedy the discrimination, perpetuating a segregationist culture where White employees are provided with opportunities for compensation, growth and advancement, and Black employees are denied these same opportunities.

25.     This is an action for declaratory relief, as well as monetary damages, to redress Defendants' unlawful employment practices against Plaintiff, including subjecting Plaintiff to disparate working conditions and pay, and by denying her the opportunity to work in an employment environment free of unlawful discrimination due to her race and religion, in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); the New York State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101, *et seq.* ("NYCHRL").

26.     Defendants' discriminatory and otherwise unlawful conduct was knowing, malicious, willful and wanton and/or showed a reckless disregard for Plaintiff, which has caused

and continues to cause Plaintiff to suffer substantial economic and non-economic damages, and severe mental anguish and emotional distress.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981.  Further, the Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

28.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c) because Defendant Goldman Sachs's headquarters are located within the Southern District of New York, and a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this District.

## PROCEDURAL REQUIREMENTS

29.     Concurrent with the filing of this Complaint, Plaintiff has filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*. ("Title VII") against Defendant Goldman Sachs.  Plaintiff's EEOC Charge of Discrimination arises out of the same facts as those alleged herein.

30.     When the EEOC completes its investigation of the Charge of Discrimination and issues Plaintiff a Notice of Right to Sue, Plaintiff will seek leave to amend this Complaint to add claims that Defendant Goldman Sachs violated Title VII as well.

## PARTIES

31.     Plaintiff Rebecca Allen is an employee of Defendant Goldman Sachs, residing in Kings County, New York.  Ms. Allen is employed by Defendants as a Vice President in the

Bank's Private Wealth Management Division.  At all relevant times, Ms. Allen met the definition of an "employee" under all applicable statutes.

32.     Defendant Goldman Sachs is, upon information and belief, a corporation duly organized under the laws of the State of Delaware and is registered as a foreign business corporation in the State of New York.  Goldman Sachs maintains its principal place of business at 200 West Street, New York, New York 10282.  Goldman Sachs is a self-described leading investment banking, securities and investment management firm, providing a wide range of financial services to corporations, financial institutions, governments and individuals.  At all relevant times, Goldman Sachs met the definition of an "employer" under all applicable statutes.

33.     Defendant Minnis is a Partner at Goldman Sachs in the Bank's Investment Banking Division.  At all relevant times, Ms. Minnis controlled significant functions of the Bank's business, was responsible for some of the discriminatory decisions set forth herein, and met the definition of an "employer" under all applicable statutes.

## FACTUAL ALLEGATIONS

**A.**     **Ms. Allen's History of Outstanding Performance at Goldman Sachs**

34.     Ms. Allen, who is Black and Jewish, is a dedicated and hard-working employee of the Bank.

35.     Ms. Allen was hired by Goldman Sachs in July 2012 as an Associate in the PWM Division of the Bank, managing the personal assets of a wide range of Private Bank clients.  The PWM Division sits within the broader Investment Management Division.

36.     By all accounts, Ms. Allen's performance at the Bank has been exemplary, as evidenced by her consistently strong reviews and positive accolades from her ultra-high net worth clients.

37.     Over her nearly five years of employment at Goldman Sachs, Ms. Allen has specifically excelled in her work in the Partner Coverage Group, successfully managing the private wealth of current and retired Partners of the Bank.

38.     Indeed, in recognition of her performance, Ms. Allen was promoted to Vice President, effective December 31, 2015.

**B.     Discrimination Committed Against Ms. Allen**

39.     Ms. Allen has been denied numerous opportunities that have had a direct impact on her compensation, earning potential and potential for future promotions.

40.     Unlike her White colleagues, Mr. Hoogkamp has never given Ms. Allen the opportunity to "steer" a potential client who comes to the Bank unsolicited.  Opportunities to steer are vital, as they are one of the ways in which PWM employees can add to their book of business, which has a direct correlation to compensation and promotion opportunities.

41.     In addition, when a PWM employee leaves the Bank, his or her clients are redistributed.  Over her nearly five-year employment with Goldman Sachs, Ms. Allen has received substantially fewer and less valuable clients than her male colleagues.  Again, this has a direct impact on Ms. Allen's compensation and chances for future promotions.

42.     In or around December 2013, Ms. Allen was introduced to Mr. Saunders, a prospective wealth management client (outside of her employment with the Bank), and immediately began working to secure a relationship for PWM.

43.     Over the course of several months, Ms. Allen engaged in a number of phone calls and meetings to cultivate the relationship and develop potential management strategies in collaboration with both Mr. Saunders and his then-current investment banking relationship partner at Goldman Sachs.

44.     Largely as a result of Ms. Allen's contributions, Mr. Saunders expressed interest in committing a significant amount of assets to the management of PWM.

45.     This relationship would, over time, produce substantial revenue for PWM, including potentially millions of dollars in fees to Goldman Sachs annually, and would have resulted in a correspondingly significant increase in Ms. Allen's own compensation.  Ms. Allen estimates that she would have earned $300,000 per year as a result of this relationship.

46.     However, in or around Fall 2016, Defendant Minnis become Mr. Saunders's investment banking relationship partner.

47.     Shortly thereafter, in or around mid-November 2016, Ms. Allen was abruptly removed from a potential PWM relationship without explanation, despite her invaluable contributions over the previous three years.

48.     Mr. Jassem, a MD in the PWM Division and Ms. Allen's immediate supervisor, was concerned about the loss of this potential client after the extensive work Ms. Allen had already invested in the relationship.  He volunteered to speak with Ms. Minnis, who was responsible for removing Ms. Allen, to determine the basis for the transfer.

49.     Mr. Jassem spoke with Ms. Minnis on or about November 18, 2016.  Immediately after that conversation, Mr. Jassem told Ms. Allen that Ms. Minnis had made an anti-Semitic comment during the conversation and said "*all this racist stuff*," suggesting that Ms. Allen had been removed from the relationship because she is Black and Jewish.

50.     Mr. Jassem further stated to Ms. Allen that he was so distressed by his conversation with Ms. Minnis and her discriminatory remarks that he believed he had an obligation to elevate the issue to Human Resources ("HR").

51.     Notwithstanding Ms. Minnis's racist and anti-Semitic remarks, however, Mr. Jassem did not in fact report her discriminatory conduct to HR, likely to due to her position as a Partner at the Bank.  In fact, upon information and belief, Mr. Jassem did absolutely nothing to address Ms. Minnis's racist and anti-Semitic employment decision.

52.     Indeed, rather than reporting Ms. Minnis to HR as he acknowledged he was obliged to do, Mr. Jassem instead actively attempted to shield Ms. Minnis from the consequences of her discriminatory misconduct.

53.     By way of example only, on or about February 8, 2017, Ms. Allen confronted Mr. Jassem about his failure to take any remedial steps in response to Ms. Minnis's admitted discriminatory misconduct.

54.     Mr. Jassem responded by attempting to cover-up Ms. Minnis's racist comments – and his failure to report such misconduct – by lying about his first admission and instead claiming that Ms. Minnis had *only* made anti-Semitic comments and not the other "*racist*" comments, as he had originally admitted to Ms. Allen.

55.     When Ms. Allen insisted that not only was Mr. Jassem changing his account of the November 8, 2016 meeting, but also, because Ms. Allen is Jewish, that Ms. Minnis's anti-Semitic remarks likewise constituted unlawful discrimination, Mr. Jassem went so far as to blame Ms. Allen for reacting to Ms. Minnis's misconduct and accused her of being "*hypersensitive*."

56.     This outrageous attempt by Mr. Jassem to change his story and blame Ms. Allen for her reaction further demonstrates the callousness with which Goldman Sachs treats its employees of color, and the lengths that senior executives will go to protect partners at the Bank

– even one who admitted to making personnel decisions based on an employee's race and religion.

57.     Not surprisingly, no remedial action has been taken by Goldman Sachs, and Ms. Allen has been permanently removed from the PWM relationship because of her race and religion.

58.     Instead, Goldman Sachs has continued to cover-up Ms. Minnis's discriminatory comments and decision making by advancing new and inconsistent rationales for the decision to remove Ms. Allen from the Saunders relationship.  In April 2017, Ms. Allen was told by Employee Relations that she was removed from the account because Mr. Saunders was not impressed with her, a blatant lie.  Ms. Allen was also told that Mr. Giglio believed that the relationship had been assigned to another employee all along.  This is simply untrue.  Goldman Sachs maintains a database, the "t-list," to which Mr. Giglio has access, that shows who is assigned to each relationship.  Ms. Allen was clearly identified as the point person for Mr. Saunders on the t-list.

59.     As a result of the discrimination committed against Black employees at Goldman Sachs, including Ms. Allen, they are denied opportunities for compensation and advancement and are paid less and promoted far less often than their similarly-situated White colleagues.

60.     As a direct and proximate result of Defendants' unlawful actions, Ms. Allen has suffered, and will continue to suffer, monetary and/or economic damages, including, but not limited to, the loss of past and future income, compensation and other benefits to which she would otherwise be entitled.

61.     As a further direct and proximate result of Defendants' unlawful actions, Ms. Allen has suffered damage to her reputation and career.

11

62.     As a further direct and proximate result of Defendants' unlawful actions, Ms. Allen has suffered severe mental anguish and emotional distress.

63.     Defendants' unlawful conduct against Ms. Allen was intentional and malicious and/or showed a deliberate, willful, wanton and reckless disregard for Ms. Allen's rights under federal, state and local law.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Discrimination in Violation of Section 1981)
#### *Against All Defendants*

64.     Plaintiff hereby repeats and realleges each and every allegation in the foregoing paragraphs as if set forth fully herein.

65.     Defendants have discriminated against and harassed Plaintiff on the basis of her race and/or color in violation of Section 1981 by denying her the same terms and conditions of employment available to employees who are not Black, including, but not limited to, subjecting her to disparate working conditions and compensation because she is Black, and denying her the opportunity to work in an employment environment free of unlawful discrimination due to her race.

66.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

67.     As a direct and proximate result of Defendants' unlawful discriminatory and harassing conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

68.     Defendants' unlawful discriminatory and harassing conduct constitutes a willful and wanton violation of Section 1981, was outrageous and malicious, was intended to injure Plaintiff, and was committed with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Discrimination in Violation of the NYSHRL)
*Against All Defendants*

69.     Plaintiff hereby repeats and realleges each and every allegation in the foregoing paragraphs as if alleged fully herein.

70.     Defendants have discriminated Plaintiff on the basis of her race, color and/or religion in violation of the NYSHRL by denying her the same terms and conditions of employment available to employees who are not Black and/or Jewish, including, but not limited to, subjecting her to disparate working conditions and compensation because she is Black and/or Jewish, and denying her the opportunity to work in an employment environment free of unlawful discrimination due to her race and religion.

71.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

72.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Discrimination in Violation of the NYCHRL)
### *Against All Defendants*

73.     Plaintiff hereby repeats and realleges each and every allegation in the foregoing paragraphs as if alleged fully herein.

74.     Defendants have discriminated Plaintiff on the basis of her race, color and/or religion in violation of the NYCHRL by denying her the same terms and conditions of employment available to employees who are not Black and/or Jewish, including, but not limited to, subjecting her to disparate working conditions and compensation because she is Black and/or Jewish, and denying her the opportunity to work in an employment environment free of unlawful discrimination due to her race and religion.

75.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered and continues to suffer monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

76.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

77.     Defendants' unlawful discriminatory and harassing conduct constitutes a willful and wanton violation of the NYCHRL, was outrageous and malicious, was intended to injure Plaintiff, and was committed with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.      A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York, and the City of New York;

B.      An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.      An order directing Defendants to place Ms. Allen in the position she would have occupied but for Defendants' discriminatory and otherwise unlawful treatment of her, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices and otherwise unlawful conduct are eliminated and do not continue to affect Ms. Allen;

D.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Ms. Allen for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

E.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Ms. Allen for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical or mental injuries;

F.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Ms. Allen for harm to her professional and personal reputations and loss of career fulfillment;

G.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Ms. Allen in an amount to be determined at trial, plus prejudgment interest;

H.      An award of punitive damages;

I.      An award of costs that Ms. Allen has incurred in this action, as well as Ms. Allen's reasonable attorneys' fees to the fullest extent permitted by law; and

J.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: August 16, 2017
      New York, New York

**WIGDOR LLP**

By: _____
        Douglas H. Wigdor
        Michael J. Willemin

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@wigdorlaw.com
mwillemin@wigdorlaw.com

**GOODSTADT LAW GROUP PLLC**

By: __/s/ Andrew S. Goodstadt_____
        Andrew S. Goodstadt
        George Vallas

520 Eighth Avenue, 14th Floor
New York, NY  10018
Telephone: (646) 430-8295
Facsimile: (646) 430-9294
agoodstadt@goodstadtlaw.com
gvallas@goodstadtlaw.com

*Counsel For Plaintiff*